**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1773

RUSSELL L. MOODY,

Petitioner,

v.

HUNTINGTON INGALLS INCORPORATED; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT
OF LABOR,

Respondents.

On Petition for Review of an Order of the Benefits Review Board.  (15-0314)

Argued:  October 25, 2017                                    Decided:  January 3, 2018

Before GREGORY, Chief Judge, NIEMEYER, and AGEE, Circuit Judges.

Reversed and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

**ARGUED:**  John Harlow Klein, MONTAGNA KLEIN CAMDEN LLP, Norfolk, Virginia, for Petitioner.  Christopher R. Hedrick, MASON, MASON, WALKER & HEDRICK, PC, Newport News, Virginia, for Respondent Huntington Ingalls Incorporated. **ON BRIEF:**  Jonathan H. Walker, Bradley D. Reeser, MASON, MASON, WALKER & HEDRICK, PC, Newport News, Virginia, for Respondent Huntington Ingalls Incorporated.

GREGORY, Chief Judge:

Russell L. Moody, a shipyard employee, suffered a workplace injury but did not undergo surgery until after he retired. He sought disability benefits for the two-month, post-surgery period during which he was not medically cleared for work. The Department of Labor's Benefits Review Board denied his disability claim under the Longshore and Harbor Workers' Compensation Act (the "LHWCA" or "Act"). 33 U.S.C. §§ 901, 902(10), 908. The sole question on appeal is whether voluntary retirement before the onset of a workplace injury's debilitating effects precludes the existence of a "disability." 33 U.S.C. § 902(10). We hold that it does not and reverse and remand.

I.

A.

Appellant Russell Moody began working for Appellee Huntington Ingalls Inc. ("Huntington") in 1966, when he was only 20 years old. He continued to work for Huntington for 45 years, as a rigger, a welder, and a truck driver. In June 2011, Huntington assigned Moody to a new shift. On Aug. 1, 2011, unhappy with the shift, Moody gave his requisite 90-day notice of retirement, effective Oct. 31, 2011.

During that 90 day-window, on Sep. 19, 2011, Moody injured his right shoulder in the shipyard. While using the steering wheel of his truck to pull himself into the driver's seat, Moody tore his rotator cuff along with other parts of his shoulder. Even though the injury required surgery, Moody continued to work as a driver and received his normal wages. On Oct. 31, he retired from the shipyard as planned.

2

On Dec. 13, 2011, Moody underwent shoulder surgery. According to his physician, Moody needed to remain "out of work" until Feb. 16, 2012 to recover from surgery. J.A. 154, 171–72. Moody could then work with certain limitations from Feb. 17 to Mar. 28 and with no restrictions thereafter. Since his retirement from the shipyard, Moody has not worked or pursued any job opportunities.

Huntington paid for the costs of surgery but refused to pay Moody temporary total disability benefits for the post-operation recovery period from Dec. 13 to Feb. 16. Huntington does not dispute that the injury was otherwise a compensable, workplace injury under the LHWCA that would have entitled Moody to disability benefits had he undergone surgery prior to retirement. *See* 33 U.S.C. § 903.

B.

Moody brought his claim for temporary total disability benefits before an administrative law judge ("ALJ") in the Department of Labor. 33 U.S.C. § 919(d) (providing for ALJs). To demonstrate a compensable "disability" under the LHWCA, Moody must show that he suffered an "incapacity because of injury to earn . . . wages." 33 U.S.C. § 902(10).

The ALJ ruled in Moody's favor and awarded temporary benefits. He concluded that Moody was totally incapacitated during the recovery period and that his workplace injury caused the incapacity. He also noted that Moody performed his duties in good faith even while injured and that, had Moody undergone surgery immediately, Huntington would have had to pay disability benefits in addition to the wages of a replacement driver. Although the ALJ found that Moody voluntarily retired for reasons unrelated to his injury,

3

he ultimately concluded that retirement is irrelevant to the definition of "disability" under the LHWCA.

However, the Board, on appeal, disagreed and concluded that Moody was not entitled to any disability benefits because he voluntarily retired before the onset of his workplace injury's debilitating effects. The Board reasoned that voluntary retirement results in a total loss of ability to earn wages, such that no injury could cause any further loss of economic capacity. This appeal followed.[*]

II.

We have jurisdiction to review direct appeals from the Benefits Review Board under 33 U.S.C. § 921(c). The factual findings of the ALJ are reviewed for substantial evidence. *See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 380 (4th Cir. 1994). "Review of legal questions is de novo, and no deference is due to the Board's legal conclusions." *Newport News Shipbuilding & Dry Dock Co. v. Riley*, 262 F.3d 227, 231 (4th Cir. 2001). Because the ALJ's factual findings are not disputed and are supported by substantial

---

[*] Following oral argument in this case, Huntington Ingalls opted to pay Moody the benefits for the two-month recovery period and moved to dismiss the case as moot. Moody opposed the motion. We deny that motion and proceed with the merits because Huntington Ingalls has not shown that the challenged conduct is not likely to recur, particularly given the BRB's several decisions erroneously interpreting "disability" under the LHWCA. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see, e.g., Christie v. Georgia-Pacific Co.*, BRB No. 16-0321, 2017 WL 2572359, at *2 (Mar. 7, 2017); *Eason v. Huntington Ingalls Inc.*, BRB No. 16-0082, 2016 WL 8315589, at *3 (Sept. 20, 2016).

4

evidence, we proceed directly to the BRB's legal conclusion that voluntary retirement made Moody ineligible for disability benefits.

A.

For matters of statutory interpretation, we first "look to the statutory text, and absent a different definition, we interpret statutory terms 'in accordance with their ordinary meaning.'" *PETA v. United States Dep't of Agric.*, 861 F.3d 502, 509 (4th Cir. 2017) (quoting *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013)). Under the LHWCA, "'[d]isability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U.S.C. § 902(10). Nothing in the statute expressly addresses retirement or its timing: the only reference to time requires the assessment of earning capacity at the time of injury, not the time of retirement. *Id.* Instead, the Board and Huntington would insert a new requirement into the statute by misconstruing the plain meaning of "incapacity" and the real-world significance of retirement.

The ordinary meaning of "incapacity" precludes the Board's and Huntington's interpretation that an employee's retirement necessarily makes him incapable of earning any wages. 33 U.S.C. § 902(10). "Incapacity," as used today and circa 1927 when the LHWCA was passed, has meant "inability," "incompetence," and "incapability." Oxford English Dictionary (1933). There is no dispute that, apart from the two-month recovery period, Moody had the ability, competence, and capability of being a truck driver and earning wages on the days before and after his retirement. Retirement, quite simply, is not

inherently debilitating.  By focusing on the voluntary nature of Moody's retirement, both the Board and Huntington Ingalls confuse being *unwilling* with being *unable*.

Huntington and the Board also erroneously equate loss of earning capacity with loss of actual earnings.  Moody's injury did not cause him to lose any income during his recuperation, but it did deprive him of the ability to work.  In asking the Court to interpret incapacity as actual wage loss, Huntington cites cases that characterize "disability" as an "economic harm." *E.g.*, *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 126 (1997); *Norfolk Shipbuilding & Drydock Corp. v. Hord*, 193 F.3d 797, 799–802 (4th Cir. 1999).  However, Huntington omits that those cases specifically define "economic harm" as lost capacity to earn wages, not actual economic loss.  *See Rambo*, 521 U.S. at 126 ("The Act speaks of this economic harm as 'disability,' defined as the 'incapacity because of injury to earn [] wages.'"); *Hord*, 193 F.3d at 800 ("The Act provides compensation not for the injury itself, but for the economic harm suffered as a result of the decreased ability to earn wages.").  In any event, our interpretation of the LHWCA does not deprive "disability" of its economic character.  Rather than compensating Moody for a torn rotator cuff, the LHWCA mandates compensation for the lost earning capacity—an economic injury—that he suffers as a result of the torn rotator cuff.

As the Supreme Court has held, "[c]apacity, and thus disability, is not necessarily reflected in actual wages earned after injury, and when it is not, the factfinder under the Act must make a determination of disability that is reasonable and in the interest of justice, and one that takes account of the disability's future effects." *Rambo*, 521 U.S. at 127–28. The *Rambo* Court held that an employee may still be eligible to receive disability benefits

6

under the LHWCA even if his post-injury wages are higher than his pre-injury wages, upon a determination that the employee's earning capacity is likely to fall below pre-injury levels in the future. *Id.* at 128. Similarly, in this case, actual wage loss does not fully capture the loss of capacity caused by Moody's shoulder injury. The ALJ here followed *Rambo*'s instruction in deciding that the interests of justice and public policy weigh in favor of granting benefits. *See* J.A. 59–60. To decide otherwise would not only deprive Moody of his rightful benefits but would also confer a windfall on Huntington: it is undisputed that Moody would have received disability benefits had he undergone surgery immediately, rather than discharging his duties in good faith, and Huntington would have had to pay for another driver. *Id.*

The fact that Moody did not actually work or seek job opportunities after retirement does not change the analysis. That fact goes to actual economic loss but not incapacity. Because the LHWCA compensates workers for their inability to earn wages due to injury, workers are entitled to disability benefits when an injury is sufficient to preclude the possibility of working. Here, Moody could have changed his mind and chosen to work even after retiring, perhaps in a job that offered better hours. *See Rambo*, 521 U.S. at 132 (holding that LHWCA contains "mandate to account for the future effects of disability" when fashioning disability awards). His shoulder injury and the resulting surgery took that choice away from him for at least two months. The law compensates that deprivation of economic choice when it is caused by workplace injury.

In sum, voluntary retirement is not a form of total incapacity. As the Board has determined in the past, retirement status, standing alone, is irrelevant to earning capacity

7

and the determination of "disability" under 33 U.S.C. § 902(10). *See Raymond Harmon v. Sea-Land Service Inc.*, 31 BRBS 45 (May 14, 1997) ("The sole relevant inquiry in this case with regard to claimant's burden of proof on disability is whether claimant's work injury precludes his return to his usual work."); *Robert Carrion v. SSA Marine Terminals, LLC.*, BRB No. 12-0601, 2013 WL 3479992, at *4 (June 25, 2013) ("The only relevant inquiry . . . is whether claimant's work injury precludes his return to his usual work.").

B.

Huntington also argues that the original purpose of the LHWCA was to compensate workers for actual wage loss. It theorizes that the LHWCA was modeled after the New York Workers' Compensation Act ("the NYWCA") and that the NYWCA only compensated actual wage loss. While the LHWCA adopted many provisions from the NYWCA, the legislative history cited by Huntington also shows that there were points of departure. H.R. Rep. No. 69-1190 at 2–3 (1926). Instead, the purpose of the LHWCA was not to emulate the NYWCA *per se* but to enact a "humanitarian legislation" that afforded workers with "protection" that was "almost universally recognized as necessary in the interest of social justice between employer and employee." *Id.* at 3.

Indeed, the Supreme Court has recognized that "the LHWCA represents a compromise between the competing interests of disabled laborers and their employers." *Potomac Elec. Power Co. v. Dir., Office of Workers' Comp. Programs*, 449 U.S. 268, 281–82 (1980). Under this compromise, employees give up the possibility of greater damages in tort litigation "in return for the certainty of compensation payments." *Id.* at 281–82, n. 24 (quoting 1 M. Norris, The Law of Maritime Personal Injuries § 55, at 102 (3d ed. 1975));

8

*see* 33 U.S.C. § 905 (making recovery under the LHWCA the exclusive remedy for covered employees). We give effect to that compromise by applying the plain text of the statute and by adopting the interpretation that affords greater certainty of coverage if the text is ambiguous. *See Sidwell v. Express Container Servs., Inc.*, 71 F.3d 1134, 1140 (4th Cir. 1995) (recognizing that interpretation under the LHWCA should "achieve the 'broad' remedial purposes for which the legislation was enacted") (quoting *P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 74, 78 (1979)). Here, we give effect to the plain text of the LHWCA and conclude that earning capacity is distinct from actual wages.

In sum, Huntington has not shown, and the Court has not found, any evidence that the LHWCA modeled its definition of "disability" after the NYWCA's. The legislative history surrounding the LHWCA does not suggest a conclusion contrary to the clear definition of "disability" and the plain meaning of "incapacity" under 33 U.S.C. § 902(10).

## III.

Because we hold that the Benefits Review Board misinterpreted 33 U.S.C. § 902(10), we reverse and remand for further proceedings as may be appropriate.

*REVERSED AND REMANDED*